UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**ERIC WARE,**
       **Plaintiff,**

vs.                                                        07-3013

**AUSTIN RANDOLPH, et al.,**
       **Defendants.**

### MEMORANDUM OPINION AND ORDER

Before the court are the defendants', Bart Brown, Martha Endres Ed Huggins, Matt Rains, Austin Randolph and Ruth Woods, summary judgment motion [108], the plaintiff's response [118] and the defendants' reply [123].

### Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy,

1

speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## Background

The plaintiff Eric Ware, an inmate of the Illinois Department of Corrections, brought the instant suit pursuant to 42 U.S.C. §1983 alleging violations of his constitutional rights while he was incarcerated at Illinois River Correctional Center. *See Plaintiff's amended complaint* [76]. In his amended complaint, the plaintiff claims against these defendants as follows:

1. Defendants Huggins and Randolph violated Plaintiff's First Amendment rights when they refused to allow him to mail correspondence and letters with drawings and/or notes on the envelopes.
2. Defendant Huggins and Randolph violated Plaintiff's Eighth Amendment rights when they subjected him to second hand smoke although Plaintiff is asthmatic.
3. Defendants Brown and Rains retaliated against him and violated Plaintiff's First Amendment rights when they issued Plaintiff an investigation ticket and placed him in segregation because he filed the instant lawsuit.
4. Defendant Randolph violated Plaintiff's First Amendment rights when Plaintiff was placed in segregation under investigation for charging inmates for completion of their legal work and then transferred to another institution.
5. Defendants Endres and Woods violated Plaintiff's First Amendment rights when they refused to allow him emergency medical attention, refused to give him grievance forms, and refused to allow him access to the law library on 3/20/07.

Defendants deny violating Plaintiff's constitutional rights and seek summary judgment in their favor and against Plaintiff.

## Undisputed material Facts[1]

1. Illinois River Correctional Center has a regulation that prevents inmates from mailing envelopes with drawings or writing on them other than the mailing address, return address, and/or notation indicating if it is privileged. (Affidavit of Austin Randolph ("Randolph Affidavit"), attached as Exhibit A).
2. The regulation at issue in this case was implemented on September 1, 2005, by former Warden Hulick in Warden's Bulletin No. 2005-07 RE: Defacing or Alteration of Inmate Correspondence. (Randolph Affidavit).
3. Specifically, the regulation states "Effective September 1, 2005, outgoing envelopes (write-outs) are NOT to have drawings or writing on them, other than the mailing address, return address, and/or notation indicating if a mailing is legal or privileged.

---

[1]Defendants' exhibits are attached to their memorandum of law [109].

|     |     |
| --- | --- |
|     | Mail received in the mailroom found to be out of compliance with this directive will be sent back to the sender." (Randolph Affidavit). |
| 4.  | Plaintiff claims that he was prevented from mailing two letters due to this regulation. (Deposition of Eric Ware ("Dep."), attached as Exhibit B, at p. 47). |
| 5.  | First, Plaintiff attempted to mail a letter in an envelope with a handwritten "notice" on the outside stating something to the effect of "[y]our bank will be sued." (Dep. at pp. 41-42). |
| 6.  | The contents of this letter were returned to Plaintiff with a notice informing him why it was not mailed. (Dep. at p. 43). |
| 7.  | Next, Plaintiff attempted to mail an envelope with an altered return address. (Dep. at p. 46). |
| 8.  | This letter was also returned, but was mailed out the second time Plaintiff sent it. (Dep. at p. 47). |
| 9.  | Plaintiff admits that he was aware of the regulation when he attempted to mail the two letters. (Dep. at p. 45). |
| 10. | Plaintiff testified that he decided to violate the policy anyway "[b]ecause the warden don't have jurisdiction to bridge my first amendment rights..." and because "I just didn't want to do it like that." (Dep. at p. 45 & p. 48). |
| 11. | Defendant Brown recalls that former Warden Hulick implemented the instant regulation in an effort to clean up the outgoing mailings and to avoid the possibility of messages being passed on the outside of an envelope. (Affidavit of Bart Brown "Brown Affidavit", attached as Exhibit C). |
| 12. | The mailroom always refused to mail out envelopes with obscene drawings, gang insignia, or hidden messages of a security threat group. (Brown Affidavit). |
| 13. | Prior to this policy being initiated, the mailroom staff would have had to make judgment calls as to whether a particular drawing or message was STG-related. (Brown Affidavit). |
| 14. | Making such determinations can be a labor intensive and time consuming task. (Brown Affidavit). |
| 15. | Staff that is not familiar with STGs may not be able to recognize gang insignia or hidden messages. (Brown Affidavit). |
| 16. | A blanket prohibition against all written messages and drawings creates uniform rules on all outgoing correspondence, thereby reducing the burden on the mailroom staff. (Brown Affidavit). |
| 17. | In addition, the policy relieves the very real security risk of messages being passed to individuals other than the addressee via the outside of the envelope. (Brown Affidavit). |
| 18. | Importantly, the policy does not prevent offenders from corresponding with the free community; they must simply refrain from altering or defacing the outside of their envelopes in order to send mail. (Brown Affidavit). |
| 19. | Defendant Randolph also believes that the policy helps maintain good order and efficiency in the mailroom and precludes the possibility of offenders passing messages to individuals other than the addressee via the outside of the envelope. (Randolph Affidavit). |
| 20. | Randolph has never found occasion to alter or suspend the policy. (Randolph Affidavit). |
| 21. | No one refused to mail Plaintiff's correspondence. (Randolph Affidavit). |

22. Plaintiff's mail was returned because it was not in compliance with the policy on outgoing mail. (Randolph Affidavit).
23. Plaintiff alleges that he was exposed to second hand smoke for the entire duration of his stay at Illinois River Correctional Center. (Plaintiff's Response to Defendants' Interrogatories ("Interrogatories"), attached as Exhibit D, at #5).
24. Plaintiff alleges that the smoke exposure exacerbated his serious medical conditions of asthma and high blood pressure. (Dep. at p. 48).
25. Plaintiff alleges that the effects of the second hand smoke were breathing complications, headaches, nausea, sinus inflamation, burning eyes, and chest pains. (Interrogatories at #6; Plaintiff's Amended Complaint at ¶2).
26. Plaintiff admits that his physicians never told him that he couldn't be around second hand smoke. (Dep. at pp. 51-52).
27. Plaintiff was housed in a non-smoking cell at Illinois River Correctional Center. (Plaintiff's Amended Complaint at ¶2).
28. Plaintiff complains that the smoke traveled through the vents into his nonsmoking cell. (Randolph Affidavit).
29. Plaintiff also complains that he was "almost precluded from his dayroom activities" because it was clouded with cigarette smoke from inmates and staff. (Plaintiff's Amended Complaint at ¶2).
30. Defendant Randolph, who is reasonably familiar with the level of smoke at Illinois River, does not believe that it is excessive, especially within the confines of a non-smoking cell. (Randolph Affidavit).
31. Plaintiff is not forced to go to the dayroom; he could choose to stay within the confines of his non-smoking cell. (Randolph Affidavit).
32. Plaintiff admits that he never informed Defendants Huggins or Randolph of his high blood pressure. (Dep. at p. 54).
33. Plaintiff alleges that he informed Defendants Huggins and Randolph that he had asthma through the institutional grievance process. (Dep. at p. 54; Interrogatories at #7).
34. Defendant Huggins is a Grievance Officer at Illinois River Correctional Center. (Randolph Affidavit).
35. Defendant Huggins did not have the authority to alter the smoking policy or the outgoing mail policy at Illinois River Correctional Center. (Randolph Affidavit).
36. Defendant Randolph never thought that exposure to second hand smoke would be any more dangerous to Plaintiff than to any other individual. (Randolph Affidavit).
37. No physician has ever instructed Plaintiff that he could not be around second hand smoke. (Dep. at pp. 51-52).
38. Plaintiff alleges that Defendant Randolph retaliated against him when Defendant Randolph "placed him in segregation under investigation for allegedly charging inmates for completion of their legal work, with zero evidence to support those contentions..." (Plaintiff's Amended Complaint at ¶3).
39. Plaintiff alleges that Defendant Rains retaliated when he "falsified a disciplinary investigation ticket." (Plaintiff's Amended Complaint at ¶10).

40. Plaintiff alleges that Defendant Brown "concurred in the falsification of plaintiff's investigation ticket in order to retaliate against him for filing suits against his co-workers".  (Plaintiff's Amended Complaint at ¶11).
41. Plaintiff also complains that he never received an "investigation hearing" within 14 days of his placement in Investigative Status.  (Plaintiff's Amended Complaint at ¶3).
42. It was Defendant Brown who issued Plaintiff the investigation report that he is complaining about, not Defendants Rains or Randolph.  (Brown Affidavit).
43. Defendant Brown is the Chief Investigator at Illinois River Correctional Center.  (Brown Affidavit).
44. Defendant Rains signed off on the investigation report in his supervisory capacity as Shift Supervisor, as he was the Shift Commander on duty at that time; this was his only involvement in the initiation of the investigation report and/or Plaintiff's placement in Investigative Status.  (Brown Affidavit).
45. Defendant Randolph did not sign off on Plaintiff's investigation report at all.  (Brown Affidavit).
46. The purported signature of "Austin Randolph" on the investigation report was made by Assistant Warden Birkey, a designee of Warden Randolph.  (Brown Affidavit).
47. Defendant Brown's job responsibilities include initiating investigative reports when offenders are suspected of committing disciplinary offenses.  (Brown Affidavit).
48. In this case, the Internal Affairs office had received information from an unidentified offender source that Plaintiff was engaged in a business venture of charging other offenders to complete their legal work.  This would be a violation of departmental rules.  (Brown Affidavit).
49. Initially, it was determined that the information might have merit as offender Ware had been known to be involved in a number of legal issues. Furthermore, this was not the first time such allegations had been made against Plaintiff. However, there had never before been an investigation into such allegations. Based on these reasons, Defendant Brown issued Plaintiff the investigative report and began looking into the allegations.  (Brown Affidavit).
50. Ultimately, Defendant Brown's initial review of the allegations did not produce any conclusive evidence that Plaintiff had in fact violated departmental rules.  (Brown Affidavit).
51. Plaintiff was released from segregation without being disciplined for the investigatory charges.  (Brown Affidavit).
52. At the time Defendant Brown initiated the investigative report, he was not aware that Plaintiff had initiated the instant law suit. (Brown Affidavit).
53. At the time he initiated the investigative report, Defendant Brown was not aware of any other particular lawsuits that Plaintiff had pending against staff. (Brown Affidavit).
54. Plaintiff alleges that Defendants Endres and Woods retaliated against him on March 20, 2007 when they denied him emergency medical attention, denied him access to the law library, and denied him grievance forms. (Plaintiff's Amended Complaint at ¶¶8-9).
55. Defendants Endres and Woods assert that they were not aware that the instant lawsuit had been initiated on March 20, 2007. (Affidavit of Martha Endres ("Endres Affidavit"),

attached hereto as Exhibit F; Affidavit of Ruth Woods ("Woods Affidavit"), attached hereto as Exhibit G).
56. Defendants Endres and Woods assert they were not aware of this lawsuit until they were served with summons and the amended complaint. (Endres Affidavit; Woods Affidavit).
57. Plaintiff testified that Defendants Endres and Woods both knew he filed this lawsuit because he sent them a copy of his amended complaint on or about March 21 or March 22, 2007. (Dep. at pp. 61-63). The court notes that Plaintiff did not sign his motion for supplemental complaint [23] seeking to add Endres and Woods as defendants until March 21, 2007, after the alleged March 20, 2007 incident.
58. Defendants Endres and Woods deny retaliating against Plaintiff on March 20, 2007. (Endres Affidavit; Woods Affidavit).
59. Defendants Endres and Woods do not recall Plaintiff requesting emergency medical attention on March 20, 2007, nor did Plaintiff appear to be in distress on that date or any other. (Endres Affidavit; Woods Affidavit).
60. There is movement protocol for Plaintiff to obtain access to the law library and grievance forms. (Woods Affidavit).
61. Defendants Endres and Woods did not deny Plaintiff access to the law library or grievance forms. (Endres Affidavit; Woods Affidavit).
62. Plaintiff failed to fully and properly exhaust his administrative remedies with respect to his Eighth Amendment ETS claim and his retaliation claims against Defendants Brown, Rains, and Randolph. (Three (3) Affidavits of Sherry Benton ("Benton Affidavits"), attached collectively hereto as Exhibit E).
63. Plaintiff filed a grievance at the institutional level regarding second hand smoke exposure. (Randolph Affidavit).
64. The only correspondence received at the ARB regarding second hand smoke at Illinois River was a handwritten letter that was returned to Plaintiff, unreviewed. (Benton Affidavits).
65. Plaintiff never filed a timely grievance to the ARB regarding second hand smoke issues during the time period of 8/24/06 - 4/18/07. (Benton Affidavits).
66. Plaintiff did file timely grievances regarding his placement in investigative status and the alleged retaliatory staff conduct of Warden Randolph, Major Rains, Lt. Brown, and C/O Woods. (Benton Affidavits).
67. According to ARB records, Plaintiff's grievances addressing these issues were received by the ARB on May 4, 2007 and July 4, 2007, and responded to on July 30, 2007 and September 12, 2007. (Benton Affidavits).
68. The plaintiff submitted his original complaint [1] against Osafa, Neuendorf (for inadeaute medical care), Huggins and Randolph (second hand smoke) to this court on January 12, 2007. He filed a motion for supplemental pleadings wherein he sought to add Endres and Woods as defendants on March 26, 2007 [23]. The plaintiff submitted an amended complaint [40] seeking to add defendants Huggings, Randolph, Brown, Rains, Endres and Woods and retaliation claims against these defendants on April 26, 2007.

The court notes that in response to the defendants' undisputed material facts, the plaintiff denies 24 facts and asks the court to see Affidavits # 1 and Exhibit #2, consisting of at least 49

pages, without pointing to specific cites within those 49 pages. "Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment state to paw through the assembled discovery material. 'Judge are not like pigs, hunting for truffles buried in' the record." *Albrechtsen v. Bd. of Regents,* 2002 WL 31397690 (7th Cir. 2002), *quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Furthermore, the court notes that his attachments do not prove that he exhausted administrative remedies, prior to filing this lawsuit, as to the ETS issue and claims of retaliation.

### Discussion and Conclusion

As a matter of law, the Plaintiff's First Amendment rights were not violated in relation to the outgoing mail policy. Prisoners have a First Amendment right both to send and receive mail. *Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir. 2005). However, legitimate governmental interests in the order and security of penal institutions justify the imposition of certain restrictions on inmate correspondence. *Procunier v. Martinez*, 416 U.S. 396, 412-13 (1974)(overruled on other grounds). In this case, Illinois River Correctional Center has a regulation that prevents inmates from mailing envelopes with drawings or writing on them other than the mailing address, return address, and/or notation indicating if it is privileged. (Randolph Affidavit; Warden's Bulletin No. 2005-07). Plaintiff claims that this regulation has abridged his First Amendment rights, however his claim fails as a matter of law because the regulation is reasonably related to inmate security and allocation of staff resources and is generally necessary to further those penological interests.

Generally, prison regulations that restrict an inmate's constitutional rights will be upheld so long as they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). A court must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). In addition, the burden is on the inmate to prove that the regulation is invalid. *Id.* In this case, the outgoing mail regulation at Illinois River Correctional Center is reasonably related to inmate safety and security and to the proper allocation of limited staff resources, thus Plaintiff's First Amendment claim fails as a matter of law. The regulation at issue in this case was implemented on September 1, 2005, by former Warden Hulick in Warden's Bulletin No. 2005-07 RE: Defacing or Alteration of Inmate Correspondence. (Randolph Affidavit; Warden's Bulletin No. 2005-07). The regulation states "Effective September 1, 2005, outgoing envelopes (write-outs) are NOT to have drawings or writing on them, other than the mailing address, return address, and/or notation indicating if a mailing is legal or privileged. Mail received in the mailroom found to be out of compliance with this directive will be sent back to the sender." (Randolph Affidavit; Warden's Bulletin No. 2005-07).

Plaintiff claims that he was prevented from mailing two letters due to this regulation. (Dep. at p. 47). First, Plaintiff attempted to mail a letter in an envelope with a handwritten "notice" on the outside stating something to the effect of "[y]our bank will be sued." (Dep. at pp.

41-42). The contents of this letter were returned to Plaintiff with a notice informing him why it was not mailed. (Dep. at p. 43). Next, Plaintiff attempted to mail an envelope with an altered return address. (Dep. at p. 46). This letter was also returned, but was mailed out the second time Plaintiff sent it. (Dep. at p. 47). Plaintiff admits that he was aware of the regulation when he attempted to mail these two letters. (Dep. at p. 45). Plaintiff testified that he decided to violate the policy anyway "[b]ecause the warden don't have jurisdiction to bridge my first amendment rights..." and because "I just didn't want to do it like that." (Dep. at p. 45 & p. 48). Defendant Brown recalls that former Warden Hulick implemented the instant regulation in an effort to clean up the outgoing mailings and to avoid the possibility of messages being passed on the outside of an envelope. (Brown Affidavit). The mailroom always refused to mail out envelopes with obscene drawings, gang insignia, or hidden messages of a security threat group. (Brown Affidavit). Prior to this policy being initiated, the mailroom staff would have had to make judgment calls as to whether a particular drawing or message was STG-related. (Brown Affidavit). Making such determinations can be a labor intensive and time consuming task. (Brown Affidavit). Moreover, staff that is not familiar with STGs may not be able to recognize gang insignia or hidden messages. (Brown Affidavit). A blanket prohibition against all written messages and drawings creates uniform rules on all outgoing correspondence, thereby reduces the burden on the mailroom staff. (Brown Affidavit).

     In addition, the policy relieves the very real security risk of messages being passed to individuals other than the addressee via the outside of the envelope. (Brown Affidavit). The policy does not prevent offenders from corresponding with the free community; they must simply refrain from altering or defacing the outside of their envelopes in order to send mail. (Brown Affidavit). Defendant Randolph also believes that the policy helps maintain good order and
efficiency in the mailroom and precludes the possibility of offenders passing messages to individuals other than the addressee via the outside of the envelope. (Randolph Affidavit). As such, he has never found occasion to alter or suspend the policy. (Randolph Affidavit). No one refused to mail Plaintiff's correspondence. (Randolph Affidavit). It was returned because it was not in compliance. (Randolph Affidavit). Prison security, deterrence of crime, and proper allocation of limited staff resources are all legitimate penological interests which justify abridgment of the constitutional rights of incarcerated persons. *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). The previous Administration at Illinois River Correctional Center determined that the outgoing mail policy was generally necessary to further these important penological interests, and this court, as it must, gives substantial deference to that professional determination. *Overton*, 539 U.S. at 132. Plaintiff has not met his burden of proving that this regulation is invalid. Defendants Huggins and Randolph are therefore entitled to summary judgment on this claim.

     Finally, the court finds Plaintiff failed to exhaust his administrative remedies before filing suit with respect to his Eighth Amendment exposure to second smoke and retaliation claims. Plaintiff failed to fully and properly exhaust his administrative remedies with respect to his Eighth Amendment ETS claim and his retaliation claims against Defendants Brown, Endres, Rains, Randolph, and Woods. (Benton Affidavits). Pursuant to the Prison Litigation Reform

Act, all prison inmates bringing an action under 42 U.S.C. §1983, with respect to prison conditions, must first exhaust all administrative remedies available to them before being allowed to proceed with the lawsuit. 42 U.S.C. §1997e(a) (2007). Section 1997e(a) specifically provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

The exhaustion statute is "too clear" and suits "must be dismissed" if administrative remedies are not followed. *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 533, 534 (7th Cir. 1999). That exhaustion of administrative remedies would be futile is no exception or excuse to the requirement. *Id*. at 537. Plaintiff's suit must be dismissed if administrative remedies are not fully and properly exhausted. *Woodford v. Ngo*, 126 S.Ct. 2378, 2383 (2006)(holding that prisoner cannot satisfy exhaustion requirement by filing untimely or otherwise procedurally defective grievances). Furthermore, it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007). According to IDOC grievance procedures for offenders, "[t]he grievance shall contain factual details regarding each aspect of the offender's complaint, including what happened, when, where,
and the name of each person who is the subject of or who is otherwise involved in the complaint." 20 Ill. Adm. Code §504.810 (West 2007). In order to fully and properly exhaust administrative remedies, DOC inmates are required to file a grievance regarding an issue at the institutional level; receive a response from the Chief Administrative Officer of the institution (Warden) and, if the Warden denies the grievance, appeal the denial to Director through the Administrative Review Board (ARB). 20 Ill. Admin. Code 504.850 (West 2007). Therefore, unless a decision has been rendered by the Administrative Review Board, an inmate has not fully exhausted his administrative remedies.

In this case, it is undisputed that Plaintiff filed a grievance at the institutional level regarding second hand smoke exposure. (Randolph Affidavit; Grievance #07-0085). However, Plaintiff did not properly appeal this grievance to the ARB. (Benton Affidavits). The only correspondence received at the ARB regarding this issue was a handwritten letter that was returned to Plaintiff, unreviewed. (Benton Affidavits). There is no evidence, other than the Plaintiff's unsupported assertion, that he filed a timely grievance to the ARB regarding second hand smoke issues during the time period of 8/24/06 - 4/18/07. (Benton Affidavits). Plaintiff did file timely grievances regarding his placement in investigative status and the alleged retaliatory staff conduct of Warden Randolph, Major Rains, Lt. Brown, C/O Endres, and C/O Woods. (Benton Affidavits). However, according to ARB records, Plaintiff's grievances addressing these issues were received by the ARB on May 4, 2007 and July 4, 2007, and responded to on July 30, 2007 and September 12, 2007. (Benton Affidavits). With the exception of his Eighth Amendment claim, which was included in the original complaint, Plaintiff moved for leave to amend his complaint adding these claims on April 26, 2007 [40]. Thus Plaintiff did not properly exhaust his administrative remedies, as administrative remedies are to be exhausted

prior to initiating a law suit. *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 533, 534 (7th Cir. 1999)(holding that a court lacks discretion to resolve a claim on the merits where administrative remedies are exhausted after the suit is initiated but before judgment). As Plaintiff failed to fully and properly exhaust his administrative remedies with respect to his Eighth Amendment ETS claim and his retaliation claims against Defendants Brown, Endres, Rains, and Randolph, before filing his lawsuit, the court must dismiss these claims against the defendants, without prejudice.

**It is therefore ordered:**

1. **Pursuant to Fed. R. Civ. Pro. Rule 56(c), Defendants' summary judgment motion [108] is allowed as to Plaintiff's claims that Huggins and Randolph violated Plaintiff's First Amendment claim that they refused to allow him to mail correspondence and letters with drawings and/or notes on the envelopes. The clerk of the court is directed to entered judgment for Huggins and Randolph on this claim, forthwith.**
2. **Pursuant to Section 1997e(a), the Plaintiff's remaining claims as discussed supra are dismissed, without prejudice.**
3. **Any remaining matters are rendered moot and the clerk of the court is directed to terminate this lawsuit in its entirety.**
4. **If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).**

**Enter this 24th day of September 2008.**

                s\Harold A. Baker
                _____
                **Harold A. Baker**
                **United States District Judge**